# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONNIE ROSE YOUNG, | : | CASE NO. 3:13-cv-00248-GBC |
| | : | |
| Plaintiff, | : | (MAGISTRATE JUDGE COHN) |
| | : | |
| v. | : | MEMORANDUM TO DENY PLAINTIFF'S |
| | : | APPEAL |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | Docs. 6,11,12 |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM TO DENY PLAINTIFF'S APPEAL

### I. Procedural History

On April 30, 2010, Connie Rose Young ("Plaintiff") protectively filed an application for Title II Social Security Disability benefits ("DIB"), and a Title XVI application for Supplemental Security Income ("SSI"), with an alleged onset date of February 15, 2008 (Tr. 226-235, 305).

This application was denied, and on January 24, 2012 and March 20, 2012, a hearing was held before an Administrative Law Judge ("ALJ"), where Plaintiff appeared with counsel and

testified, as did medical experts and two vocational experts (Tr. 30-73). On April 12, 2012, the ALJ

issued a decision finding that Plaintiff was not entitled to DIB or SSI because Plaintiff could perform

light work involving simple, routine, repetitive tasks in a work environment free from fast-paced

production, involving simple work-related decisions, few, if any, workplace changes, and no

interaction with the public (Tr. 68-69, 20-21). On December 4, 2012, the Appeals Council denied

Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the

Commissioner. (Tr. 7, 1-5).

On February 1, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. §

405(g), to appeal a decision of the Commissioner of the Social Security Administration denying

social security benefits. Doc. 1. On May 10, 2013, Commissioner filed an answer and administrative

transcript of proceedings. Docs. 5,6. In July and August 2013, the parties filed briefs in support.

Docs. 11,12. On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. On

May 20, 2014, the parties consented to Magistrate Judge jurisdiction, and Plaintiff notified the Court

that the matter is ready for review. Docs. 14,15.

## II.     Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is

supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson

v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not

mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564

(1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir.

2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). It may be less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Moreover, the Act requires further that a claimant for disability benefits must show that he has a physical or mental impairment of such a severity that: "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

### III. Relevant Facts in the Record

### A. Background and Hearing Testimony

Plaintiff was 46 years old on her alleged onset date, a "younger individual," and she became an "individual closely approaching advanced age" on the date of the ALJ's decision (Tr. 47-48, 53).

Plaintiff attended school until ninth grade when she became pregnant, is able to communicate in English and has a work history as a factory laborer, machine operator and packer (Tr. 47-48, 68, 281-282). She failed her GED test eight times (Tr. 47-48, 53). According to the vocational expert, Plaintiff's past work was medium to heavy in exertional demands (Tr. 68, 253-254). Her past relevant work as a packer or kettle fryer (Tr. 20). She last worked in February 2008, packing apples for Rice Foods (Tr. 859). She lives with her husband, her 22-year old daughter, and her granddaughter (Tr. 47-48, 222). Plaintiff's husband is employed and the family subsists on his salary (Tr. 859).

During her hearing testimony, Plaintiff denied that she did any cooking, grocery shopping or yard work (Tr. 49). Plaintiff testified that she had a driver's license, but did not visit others or eat in restaurants (Tr. 50). Plaintiff stated that she could bend over and touch her toes and squat to pick up a pen (Tr. 50). Plaintiff thought that she could walk for about 30 minutes before needing to rest and sit for about one hour before needing to change positions (Tr. 50-51). Plaintiff said that she could do laundry and wash the dishes, but that it would take her 6 or 7 hours to finish doing the dishes (Tr. 52-53). Plaintiff stated that she went on vacation when she was able, and had gone camping for one week at Cowans Gap State Park during 2010 (Tr. 50).

In her written statements, Plaintiff reported a less restricted range of daily activities. She wrote that she arose at 7:30 AM in the morning to get her granddaughter off to school (Tr. 260). During the day, Plaintiff said that she played games on the computer, watched television, cleaned the bathroom or mopped the floor, and prepared supper in the late afternoon (Tr. 260). In the evenings, Plaintiff made sure her granddaughter did her homework and showered, and cared for pets (Tr. 261). Plaintiff reported that she cooked frozen food, and that once or twice per week, she

prepared a complete meal, which would take her one or two hours (Tr. 261). Plaintiff wrote that she did housecleaning all week, and laundry all day on Sundays (Tr. 262). Plaintiff stated that she continued to drive, went outside daily, and went grocery shopping every other week for one to two hours (Tr. 263-264). She reported that she was able to pay bills and manage her finances (Tr. 263).

## B. Relevant Medical Evidence

During 2009, Plaintiff received treatment from Dr. Paul Zeshonsky, her long-term family practitioner at Gettysburg Family Practice (Tr. 255, 553). In January 2009, Plaintiff reported a great deal of chronic pain all over her body (Tr. 555). They discussed the symptoms of depression, and while Plaintiff seemed to give some positive responses for depression symptoms, she nonetheless "vehemently denied" feeling depressed (Tr. 555). Plaintiff declined a referral for a psychiatric consultation, saying that she did not need to see a psychiatrist (Tr. 555). Plaintiff's husband inquired about the possibility of Plaintiff applying for disability, and Dr. Zeshonsky responded that it was his hope that with treatment, Plaintiff would feel "well enough to eventually resume work," but that short-term disability might be reasonable idea (Tr. 555).

In February 2009, Plaintiff reported ongoing pain from her fibromyalgia, denied that she was depressed, and maintained that she was not able to get back to work (Tr. 553). She stated that she no longer drove due to concentration problems, was anxious at times, and was taking Cymbalta (an anti-depressant medication (Tr. 553). Her musculoskeletal exam revealed multiple trigger points over her upper back scapular area (Tr. 553). Dr. Zeshonsky wrote that Plaintiff was tender to touch in her arms and legs, with inappropriate levels of pain even with minimal pressure (Tr. 553). He assessed Plaintiff with fibromyalgia, suspected depression, and an Arnold-Chiari malformation of the brain,

grade I (ACM)[1] (Tr. 553). He referred Plaintiff for a rheumatology and a psychiatric consultation (Tr. 553). He prescribed a four-week aquatic physical therapy program for Plaintiff's fibromyalgia, a Vitamin D supplement, Pantoprazole Sodium for acid reflux, and continued her on Cymbalta (Tr. 257, 554).

On February 18, 2009, Dr. Zeshonsky completed a form for purposes of public welfare benefits, attesting that Plaintiff was temporary incapacitated from performing her usual occupation for a period of one year (Tr. 334-335).

During his April 9, 2009 examination, Dr. Zeshonsky wrote that it was difficult to determine whether Plaintiff "truly had a primary fibromyalgia syndrome," but he thought that her lack of sound sleep was most certainly playing a role in her generalized pain (Tr. 697). He noted that the neurosurgery department did not believe that Plaintiff's ACM was responsible for her issues, although she was found to have a low vitamin D level and was osteopenic (Tr. 559). Dr. Zeshonsky began Plaintiff on Lyrica for her fibromyalgia, thought that she would benefit from treatment for anxiety, and recommended that Plaintiff follow-up with the aquatic physical therapy he had previously ordered (Tr. 697). Plaintiff denied having any psychiatric problems (Tr. 698).

On April 22, 2009, Dr. Johar Shah, a psychiatrist, evaluated Plaintiff at Dr. Zeshonsky's request (Tr. 563-564). She complained of depression and frustration for a long time (Tr. 563). She denied any psychiatric treatment as an adult, and had been taking Cymbalta during the past year (Tr.

---

[1] Type I Chiari malformation involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem. Normally, only the spinal cord passes through this opening. Type I, which may not cause symptom, is the most common form. http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm (last visited September 25, 2014).

563). During the mental status examination, Plaintiff was kempt (Tr. 564). She was dressed appropriately, did not exhibit abnormal movements, and her behavior was described as cooperative (Tr. 564). She maintained good eye contact, her speech was normal in volume and tone (Tr. 564). Plaintiff's mood was depressed, and her affect was restricted (Tr. 564). Her thought process was mainly goal-directed, and without delusions (Tr. 564). She denied hallucinations and suicidal or homicidal ideation. (Tr. 564). Her cognition was intact, and her insight and judgment were fair (Tr. 564). Dr. Shah's impression was Major Depressive Disorder, Recurrent, Without Psychotic Features, Moderate (Tr. 564). He rated Plaintiff's current GAF at 50, which denotes serious symptoms[2] (Tr. 564). Dr. Shah increased Plaintiff's Cymbalta dosage and added Trazadone at bedtime (Tr. 564).

During an August 7, 2009 follow-up, Dr. Zeshonsky noted that Plaintiff had been put on a higher high dose of Cymbalta and begun on Trazodone (Tr. 841). Plaintiff stated her anxiety was "better" (Tr. 841). Plaintiff also reported having "less musculoskeletal aches and pains." although the aches and pains were still present (Tr. 841). Dr. Zeshonsky again recommended that Plaintiff follow-up with the aquatic physical therapy he had previously ordered (Tr. 842).

At an initial assessment session with social worker Kathleen Chapin on May 13, 2009, Plaintiff explained that her father was a very abusive alcoholic. She and her mother and brother slept together in one bedroom with the door padlocked and the windows nailed shut. She reported having nightmares about her father's abuse. Plaintiff told Ms. Chapin that her memory was very bad and she

---

[2] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic And Statistical Manual Of Mental Disorders Fourth Edition ("DSM-IV") 32 (American Psychiatric Association 1994). A GAF score of 41-50 denotes serious symptoms. DSM-IV at 32.

gets lost going to see her doctor. On mental status examination, Plaintiff was depressed, anxious, angry, and agitated. She reported getting only about an hour of sleep at night. Her memory and concentration were impaired. Her appetite and energy were decreased. Her insight and judgment appeared to be poor (Tr. 567). Ms. Chapin's diagnosis was Major Depressive Disorder, recurrent, without psychotic features, moderate and Anxiety Disorder, NOS. Psychosocial stressors – Plaintiff's medical and mental health issues – were considered severe. Her GAF was 50 (Tr. 566).

On August 11, 2009, Dr. Jennifer Wilson, a state agency physician, completed a physical residual functional capacity assessment, based upon Plaintiff's diagnoses as fibromyalgia, lumbar degenerative disc disease, and all of her other alleged impairments (mild cerebellar tonsillar ectopia, vitamin D deficiency, osteopenia, and a history of diverticulits, obesity, and headaches) (Tr. 568-574). According to Dr. Wilson, in an eight hour workday, Plaintiff could sit for a total of about six hours and stand/walk for a total of about six hours, and lift and carry, and push and pull 10 pounds frequently and 20 pounds occasionally (Tr. 568-574).

On September 30, 2010, Joseph Levenstein, Ph.D., performed a consultative psychological examination (Tr. 859-865). On September 30, 2010, when Plaintiff presented to Dr. Levenstein for a state agency-arranged clinical psychological disability evaluation, he noted that she was under the care of his colleague, Dr. Shah for medication management. Plaintiff described a troubled childhood involving physical and emotional abuse from an alcoholic parent (Tr. 861). She reported that she was taking Cymbalta, prescribed by Dr. Shah (Tr. 860). She also reported smoking 2 packs of cigarettes per day and drinking one or two pots of coffee per day (Tr. 860). Plaintiff stated that she hadn't cooked in three years because she could not remember the recipes (Tr. 860). She felt unmotivated to clean the house and her husband complained about it (Tr. 860).

On a scale of 1 to 10, Plaintiff reported that her fibromyalgia pain fluctuated from a low of 3 to a high of 10, and was typically at six or seven (Tr. 860). Dr. Levenstein concluded that Plaintiff was experiencing significant depression and anxiety (Tr. 864). He speculated that she also had post-traumatic stress disorder and a panic disorder (Tr. 864). He opined that Plaintiff could understand, retain, and follow simple one-step instructions (Tr. 864). He thought that she could not sustain attention sufficiently to complete simple, repetitive tasks (Tr. 864). He diagnosed post-traumatic stress disorder, panic disorder with agoraphobia, major depressive disorder, and borderline intellectual functioning (Tr. 864). He made checkmarks on a mental assessment form rating Plaintiff as having "marked" and "extreme" limitations in every area (Tr. 866-868).

On December 12, 2010, state agency psychologist Soraya Amanullah, Ph.D., evaluated the record evidence, including Dr. Levenstein's report, and completed a mental assessment stating that Plaintiff's impairments did not meet the severity requirements of the Commissioner's Listing of Impairments because Plaintiff had mild limitations in her activities of daily living and social functioning, and moderate limitations in his ability to maintain concentration, persistence, and pace (Tr. 885-895).

In his rationale, Dr. Amanullah noted that Plaintiff's presentation during the consultative examination differed from her presentation to Dr. Shah and her written statements about her activities (Tr. 883). He pointed out that Plaintiff had stated during the consultative examination that she "could not write a sentence," but that Plaintiff had completed her functional questionnaire thoroughly and in detail (Tr. 883). He felt that Dr. Levenstein's opinion was an overestimate of the severity of Plaintiff's limitations (Tr. 883). He noted that Plaintiff made only a single error in 8 calculations of serial-threes, and could not perform serial-sevens (Tr. 883). He further noted that

Plaintiff reported during the consultative examination that she was anxious about leaving the house, but that in her daily activities report, had stated that she was able to shop and attend family gatherings during the holidays (Tr. 883). He thought that Dr. Levenstein had relied heavily upon Plaintiff's subjective report of symptoms, but that, in his view, the totality of the evidence the totality of the evidence did not support the subjective complaints (Tr. 883). Dr. Amanullah found Plaintiff's allegations only partially credible, and his review of the medical evidence convinced him that Plaintiff retained the ability to manage the mental demands of many types of jobs not requiring complicated tasks, and could meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her mental impairments (Tr. 883).

On January 28, 2011, Dr. Shah completed a "Mental Functional Capacity Assessment" at the request of counsel, making checkmarks denoting that Plaintiff was "mildly" limited in (1) the ability to understand and remember very short and simple instructions; (2) the ability to interact appropriately with the general public; and (3) the ability to ask simple questions or request assistance (Tr. 908-909). He also made checkmarks denoting that Plaintiff was "moderately" limited in most other work-related mental areas, and "markedly" limited in four areas: (1) the ability to sustain an ordinary routine without special supervision; (2) the ability to work in coordination with or proximity to others without being distracted by them; and (3) the ability to maintain concentration for extended periods; and (4) the ability to complete a normal workweek without psychologically-based interruptions (Tr. 909-910).

In a follow-up progress note dated February 18, 2011, Dr. Shah noted that Plaintiff's mood was better, with normal thought processes and cognition and good insight and judgment (Tr. 914). He continued her on the antidepressants Cymbalta, Trazadone and Lamictal (Tr. 914).

On January 23, 2012, Dr. Shah re-evaluated Plaintiff after about a one-year lapse in treatment (Tr. 917). Plaintiff had discontinued her anti-depressant medication because she could not afford it (Tr. 917). She complained of severe depressive symptoms (Tr. 917). During the mental status examination, Dr. Shah observed Plaintiff's mood was depressed and her affect restricted (Tr. 917). Her insight and judgment were fair (Tr. 917). Dr. Shah recommended medication management and individual therapy every 2-4 weeks, and provided a four week supply of Pristiq (Tr. 917). He stated that Plaintiff could not "do work at this time due to her depression" (Tr. 917).

At the March 2012 hearing, Dr. Haddon Christopher Alexander III, who is board-certified in rheumatology and in internal medicine, appeared as a medical advisor[3] (Tr. 31). He stated that Plaintiff's fibromyalgia diagnosis had been established in 2008 through a rheumatology consultation (Tr. 32, 308). He also noted that Plaintiff's treatment records showed diagnoses of GERD, diverticulosis, a type 1 Arnold-Chiari malformation grade I, high blood cholesterol and lipids, Vitamin D deficiency, cubital tunnel release surgery in June 2010, sinusitis, multiple colon polyp, hemorrhoids, and a fatty liver (Tr. 33-4, 337). Dr. Alexander testified that Plaintiff's impairment(s) did not meet or equal the severity requirements of any impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("the Listings") (Tr. 34). Dr. Alexander testified that Plaintiff was capable of lifting, carrying, pushing and pulling 20 pounds occasionally and 10 pounds frequently, sitting six hours in an eight-hour workday, standing and walking 30 minutes for a total of four hours each, a need to avoid climbing ropes, scaffolds and ladders, and occasional climbing of stairs, balancing, stooping,

---

[3] Dr. Irving Kusher, who is also a board-certified rheumatologist, testified that, in his view, fibromyalgia was not a medically-determinable impairment, but rather as collection of symptoms, and a byproduct of depression, stress, and social anxiety (Tr. 64-65).

kneeling, crouching and crawling (Tr. 35).

At the first hearing, ALJ asked the VE to assume an individual of Plaintiff's age, education, and work experience who could perform light work involving simple, routine, repetitive tasks in a work environment free from fast-paced production, involving simple work-related decisions, and with few, if any, workplace changes, and no interaction with the public (Tr. 68-69). The expert testified that such an individual could perform the representative occupations of cleaner/housekeeper; and bakery conveyor line worker (Tr. 68-69). When the ALJ added a sit/stand option and a limitation to occasional climbing stairs, balancing, stooping, kneeling, crouching, and crawling, and no ladders, the VE testified that this would eliminate the cleaner/housekeeper job and would reduce the number of bakery worker jobs by 50% (Tr. 69-70). She also identified the occupation of machine-tending laminator (Tr. 69-70). The medical advisor testified that Plaintiff could be expected to miss more than two days a month due to her symptoms, but he later clarified that these absences would be on a voluntary basis and based on her own perception of pain (Tr. 38). At the second hearing, the VE testified that there would be no unskilled work available if the individual were to miss more than two days of work per month (Tr. 42).

## IV.    Review of ALJ Decision

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment

prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### A.      Plaintiff Allegations of Error

### 1. ALJ Review of Medical Evidence in Determining Residual Functional Capacity

Plaintiff contends the ALJ erred in finding the residual functional capacity without properly evaluating the medical evidence. Pl. Br. at 25-31, Doc 11.

### a.      Case Law and Analysis

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 404.1527(c)(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); Plummer, 186 F.3d at 429. If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to

determine the weight to give the opinion. <u>Id.</u> The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled. <u>Id.</u> Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. <u>Id.</u> The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. <u>Lyons-Timmons v. Barnhart</u>, 147 F. App'x 313, 316 (3d Cir. 2005).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." <u>Chandler</u>, 667 F.3d at 361; <u>Coleman v. Astrue</u>, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

The case law in this circuit makes clear that physician opinions are not binding upon an ALJ, and that an ALJ is free to reject a medical source's conclusions. <u>Chandler</u>, 667 F.3d 356 at 361. In so doing, however, the ALJ must indicate why evidence was rejected, so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir.1981). <u>Mistick v. Colvin</u>, No. 12-cv-1031, 2013 WL 5288261 (W.D. Pa. Sept. 18, 2013).

The ALJ relied upon the opinions of the state agency physician and state agency psychologist and Dr. Alexander's testimony, in deciding that Plaintiff was physically and mentally capable of working (Tr. 19-20). The Third Circuit has affirmed ALJ decisions involving claims of disability based upon fibromyalgia. <u>See, e.g., Prokopick v. Commissioner of Social Security</u>, 272 Fed. Appx.

196, 197 (3d Cir. 2008) (rejecting argument that medical advisor's testimony could not be relied upon, and noting that the medical advisor's statement that "fibromyalgia is 'not disabling in the majority of cases' appears to be a correct statement." [citing] Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) (Posner, J.) (noting that "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not"); Merichko v. Astrue, 363 Fed. Appx. 203 (3d Cir. 2010) (affirming ALJ decision that claimant was not disabled by fibromyalgia, carpal tunnel syndrome and other impairments, where the evidence showed that the symptoms were alleviated by medication and physical therapy). See also Wanko v. Barnhart, 91 Fed. Appx. 771, 774 (3d Cir. 2004) (holding that the ALJ could reject the opinion of treating physician Dr. Dearolf, in favor of the testimony of medical advisor Dr. Askin).

The ALJ reviewed the medical evidence to evaluate Plaintiff's residual functional capacity.

"Following a psychological consultative examination in April 2010, the claimant was assessed as unable to complete simple, repetitive tasks such as making judgments on simple work-related decisions, interacting appropriately with coworkers, supervisors and the public; and was rated with a global assessment of functioning of 35. The [ALJ] finds that these opinions are overstated in comparison to the actual clinical findings made at that time. In fact, it appears that these opinions were based on the claimant's allegations rather than the examining sources observations. For example, Dr. Levenstein noted that the claimant's 'severe anxiety and panic with agoraphobia' significantly impacted her ability to perform social interactions. Yet, upon examination, he noted that the claimant was cooperative and that rapport was easily established. There is also no indication that the claimant experienced a panic attack during the examination. The [ALJ] also finds that these opinions are not supported by the treatment notes from the claimant's treating psychiatrist, who found the claimant improved with medication. Therefore, the opinions of Dr. Levenstein are

accorded little weight." (Tr. 19) (emphasis added).

"February 2011 and January 2012 assessments by Dr. Shah, showing that the claimant is unable to work and is incapable of even low stress. The [ALJ] notes for the record that at the time of the February 2011 opinion that the claimant is unable to work, is incapable of low stress work tasks, and was rated with GAFs of 45-50, progress notes from Dr. Shah show that the claimant's mood was better and was dependent on her pain issues, was cooperative, had an appropriate affect, normal speech and a cooperative attitude. As for the January 2012 opinion of inability to work, this opinion was rendered after almost a year of no treatment or medication. Accordingly, the [ALJ] gives little weight to these opinions since they are not an accurate description of the claimant's functional abilities on a longitudinal basis with medication and treatment compliance." (Tr. 19) (emphasis added).

"In August 2009, a State agency medical consultant assessed the claimant capable of light work. This opinion is given significant weight since it is well supported by the medical and examination findings as well as the claimant's stable [symptomology] with medication." (Tr. 20).

"A State agency psychological consultant concluded that the claimant is able to meet the basic mental demands of competitive work despite the limitations resulting from her mental impairments; and that the claimant has mild restriction in activities of daily living, moderate restrictions in social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation. These opinions are given significant weight based on the clinical record as a whole, the limited treatment history, particularly the lack of counseling, and her stable symptomology with medication." (Tr. 20) (emphasis added).

"The [ALJ] gives great weight to the opinions of Dr. Alexander and Dr. Kushner that the claimant's symptoms do not meet or equal a listing section. Significant weight is also given to the

assessment by Dr. Alexander, which was for a range of light work, since it was well supported by the medical record as a whole, including the examination findings and the claimant's improvement with medication." (Tr. 20).

"Because the hypothetical posed to the vocational expert reflected claimant's RFC, and that RFC is supported by substantial evidence, the Court holds that the hypothetical was sufficiently accurate. See Covone v. Commissioner Social Sec., 142 Fed. Appx. 585, 2005 WL 1799366 (3d. Cir. July 29, 2005). As the ALJ's decision is supported by the testimony of the vocational expert, the decision is supported by substantial evidence and is, therefore, affirmed. See Plummer, 186 F.3d at 431." Robinson v. Astrue, No. 10–1568, 2011 WL 1485977, at *13 (W.D. Pa. Apr. 19, 2011).

Thus, the ALJ's RFC finding includes only "credibly established limitations" and not all impairments alleged by claimant, Rutherford, 399 F.3d at 554. Accordingly, the ALJ relied on the record and testimony in determining Plaintiff's residual functional capacity, and the findings are supported by substantial evidence.

In Chandler, 667 F.3d at 362, the Third Circuit found that the district court had erred in concluding that the "ALJ had reached its decision based on its own improper lay opinion regarding medical evidence." Id. "The ALJ– not treating or examining physicians or State agency consultants –must make the ultimate disability and RFC determinations." Id. at 361 (citing 20 C.F.R. 404.1527(e)(1), 404.1546(c)).

The regulations require the ALJ to find that Plaintiff's disability is expected to last continuously for a year. To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A) (emphasis added). Thus, Plaintiff's impairments and inability to do activities must also meet the durational requirement.

"[T]he ALJ is not bound to accept every limitation that is found by a medical professional, but rather only the ones that she finds are credibly established by the record. See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007). Contrary to Plaintiff's assertion, the ALJ did not err by incorporating into her RFC finding only those limitations which she found to be credibly established by the objective medical evidence and the Court finds that the ALJ's RFC determination as well as her ensuing hypothetical to the vocational expert both enjoy the support of substantial record evidence. Finally, the Court finds that the ALJ evaluated the medical opinion evidence properly and in accordance with the applicable rules and regulations and that substantial record evidence supports her evaluation. The ALJ gave a detailed explanation for why the medical source statements from the mental health providers were not given controlling weight the ALJ discussed at length her justification for why the medical source statements from Dr. Jahangeer and Ms. Walker were inconsistent with and contradicted by the other medical evidence of record, including their own notes and prior findings. The Court finds that the ALJ discharged her duty because she (i) demonstrated her consideration of all the relevant medical evidence, (ii) addressed the contradictory evidence in the record which conflicted with her findings, and (iii) explained why that contrary evidence was rejected or not given controlling weight. See Cotter, 642 F.2d at 705. Indeed, the overarching theme of the ALJ's decision was the complete lack of objective medical evidence which corroborated or even tended to support Plaintiff's complaints of severely disabling impairments and the Court agrees with the ALJ's finding that such corroborating evidence was woefully lacking in the record. Plaintiff's subjective complaints were corroborated only by her own self-reports, which—for the reasons discussed by the ALJ—were not particularly credible. To that end, the Court

finds that the ALJ's credibility determination is well-supported by the record and that Plaintiff's arguments to the contrary are completely unpersuasive, particularly given the minimal treatment record, the inconsistencies in the record that were highlighted and discussed by the ALJ . . . Accordingly, the Court concludes that substantial record evidence supports the ALJ's determination of non-disability." Stewart v. Astrue, No. 13–73, 2014 WL 29035, at *1, n.1 (W.D. Pa. Jan. 2, 2014) (emphasis added).

Similarly in this case, the record does not support Plaintiff's assertions of disabling severity. Plaintiff's contentions of error are inconsistent with the objective evidence and activities of daily living. From the ALJ's extensive review, substantial evidence supports the weight accorded to the allegations and opinions of record.

### b.    Plaintiff's GAF Scores

Plaintiff states the ALJ discounts Dr. Shah's assessment of a GAF of 50, claiming that it is belied by Dr. Shah's limited clinical findings, limited treatment, a purported improvement with medication, and Plaintiff's vehement insistence that she was not depressed when asked by treating doctor Zeshonsky (Tr. 19). Pl. Br. at 27 & n.6, Doc. 11. The ALJ found, "[i]n April and May 2009, the claimant was rated with global assessments of functioning of 50. However, these opinions are not supported by the limited clinical findings or the fact that in early-April 2009, the claimant 'vehemently' denied feeling depressed to Dr. Zeshonsky. These scores are also not supported by the limited treatment history and the fact that the claimant reported improvement with medication." (Tr. 19).

The Diagnostic and Statistical Manual of Mental Disorders-IV, the source of the GAF scale, instructs that a GAF score is based on the symptom severity or level of functioning at the time of the examination. Courts within the Third Circuit have accepted the Commissioner's position that GAF

scores are not dispositive of disability. See, e.g., Gilroy v. Astrue, 351 F. App'x 714, 716 (3d Cir. 2009) (explaining that a GAF score of 45 did not warrant remand given that no statement of specific functional limitations accompanied the score); Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).

See Ham v. Barnhart, No. 3:01-cv-368, 2002 U.S. Dist. LEXIS 25438, at *19 (E.D. Va. July 19, 2002) (finding a GAF of 50 alone is not sufficient to render an individual unable to work). Courts have held that the GAF scale is intended to be used to make treatment decisions, and have recognized that the regulations do not require an ALJ to determine the extent of an individual's disability based on the GAF scale. Wilkins v. Barnhart, 69 Fed. Appx. 775, 780 (7th Cir. 2003). Moreover, "there is no formalistic rule . . . that requires [a] Court to remand a case when an ALJ fails – without more – to specifically mention a low GAF score." Gilroy v. Astrue, 351 F. App'x 714 (3d Cir. 2009).

Here, the ALJ did note Dr. Shah's GAF score and his opinions, but ultimately found that Plaintiff was not disabled by her psychological symptoms, and supported that conclusion by reference to substantial evidence. The ALJ examined the record as a whole and found Dr. Shah's opinions were not supported by his limited clinical findings, or the fact that in early April 2009, Plaintiff vehemently denied feeling depressed when the issue was raised by Dr. Zeshonsky, her primary physician (Tr. 19, 555). Dr. Zeshonsky, who treated Plaintiff on a long-term basis, responded to an inquiry about disability benefits by expressing his hope that with treatment, Plaintiff would feel "well enough to eventually resume work" (Tr. 555). Plaintiff resisted his repeated instructions that she attend aquatic physical therapy. He also found the low GAF scores not supported by Plaintiff's limited psychological treatment history and the improvement in her symptoms with antidepressant medication (Tr. 19, 912). In August 2009, Plaintiff stated her anxiety

was better (Tr. 841). Plaintiff also reported having "less musculoskeletal aches and pains" (Tr. 19, 841).

During Dr. Shah's April 2009 mental status examination, Plaintiff was kempt (Tr. 564). She maintained good eye contact and her speech was normal in volume and tone (Tr. 564). Plaintiff's thought process was mainly goal-directed, and without delusions (Tr. 564). She denied hallucinations and suicidal or homicidal ideation. (Tr. 564). Her cognition was intact, and her insight and judgment were fair (Tr. 564).

As the ALJ rightly pointed out, Plaintiff's symptoms did worsen in 2012, after a long lapse in treatment and the discontinuation of medication, but her symptoms had improved in the past with medication (Tr. 19, 914). For example, in his progress note dated February 18, 2011, Dr. Shah noted that Plaintiff's mood was better on Pristiq, with normal thought processes and cognition and good insight and judgment (Tr. 914). In contrast, Dr. Shah had assessed Plaintiff with only fair insight and judgment when he initially evaluated her in 2012, when she was not, and had not been taking anti-depressant medication for many months (Tr. 917).

Although Plaintiff avers that Dr. Shah's opinion is "greatly supported" by Dr. Levenstein's consultative examination (Pl. Br. at 29), the state agency psychologist rejected the opinion (Tr. 883). Dr. Amanullah pointed out that Plaintiff had stated that she "could not write a sentence," but that Plaintiff had completed her functional questionnaire thoroughly and in detail (Tr. 883). He stated that Dr. Levenstein's assessment was an overestimate of the severity of the claimant's limitations (Tr. 883). He noted that Plaintiff made a single error in eight calculations of serial threes, but she could not perform serial sevens (Tr. 883). He further noted that Plaintiff reported at the examination that she was anxious about leaving the house, but that her daily activities report stated that she was able to shop and attend family functions during the holidays (Tr. 883). Even Dr. Shah found Plaintiff

mildly and moderately limited in the majority of areas, which contradicts Dr. Levenstein's marked and extreme ratings (Tr. 909-910).

Thus, the ALJ could discount Dr. Shah's opinions based upon the record as a whole and find Plaintiff capable of light work involving simple, routine, repetitive tasks in a work environment free from fast-paced production, involving simple work-related decisions, few, if any, workplace changes, and no interaction with the public (Tr. 68-69, 20-21).

"We further find no error with respect to the ALJ's evaluation of the Plaintiff's mental impairments in fashioning his RFC. The ALJ found Plaintiff was limited to simple, routine, repetitive tasks not involving fast pace or more than simple work decisions, and could have only incidental collaboration with coworkers and the public and collaboration with the supervisor for about 1/6 of the time. Plaintiff argues that the ALJ's RFC finding failed 'to encapsulate all of the limitations flowing from [his] severe mental illness' and contends that his low GAF score of 45 demonstrates a complete inability to work. The ALJ specifically rejected this GAF score assessed by [the treating psychiatrist], however, as inconsistent with the remaining medical evidence. An ALJ may properly reject a GAF score when it is inconsistent or unsupported by the record as a whole. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005); Blakey v. Astrue, 2010 WL 2571352 at *11 (W.D. Pa. 2010)." Klein v. Colvin, No. 13-cv-1497, 2014 WL 2562682, at *11 (W.D. Pa. June 06, 2014).

"Plaintiff next argues that the findings of consultative examiner [ ] were not properly credited by the ALJ. The ALJ noted the marked and extreme limitations findings, and low GAF score, assessed by [the consultative examiner] in his decision. The ALJ found—as did [the state agency evaluator]—that these findings were inflated, and not an accurate representation of Plaintiff's mental health history. In support of his position, the ALJ cited to Plaintiff's psychiatric treatment at Safe

Harbor between October 2009 and October 2010, which revealed a marked—and sustained—increase in Plaintiff's GAF scores, as well as improved mental functioning. Observations by [the consultative examiner] about Plaintiff's appearance were at odds with those at Safe Harbor, as was the anomalous diagnosis of PTSD. Further, [the state agency evaluator] concluded based upon her evaluation of the medical record, that [the consultative examiner's] findings were out of proportion to what was found in Plaintiff's mental treatment history. Her limitations findings did not exclude Plaintiff from finding work. The court, therefore, finds that the ALJ adequately supported his decision to accord [the consultative examiner's] findings diminished weight with substantial evidence from the medical record, particularly the lengthy treatment record from Safe Harbor, the latter portion of which revealed significant improvement in Plaintiff's mental status. Lastly, to the extent that Plaintiff argues that the ALJ erred in failing to accommodate [the consultative examiner's] finding of marked limitation with respect to interacting with the public, the ALJ clearly indicated that the work which Plaintiff could sustain would not include frequent interaction with the public. Specifically, the ALJ stated that 'the claimant has a need to avoid repetitive reaching, any climbing, and frequent interaction with the general public. As such, Plaintiff's argument is moot.' See Lamb v. Colvin, No. 12-cv-137, 2013 WL 5366260, at *10 (W.D. Pa. Sept. 24, 2013).

Similarly in this case, the ALJ weighed the evidence in the record and accommodated Plaintiff's mental impairments by limiting the residual functional capacity to a range of light exertion with the restriction to unskilled work.

## 2.   ALJ's Credibility Determination

Plaintiff contends the ALJ erred by discounting her credibility. Pl. Br. at 25, 31-33, Doc 11. The ALJ reviewed the record to evaluate Plaintiff's credibility.

When evaluating the credibility of an individual's statements, the adjudicator must consider

the entire case record and give specific reasons for the weight given to the individual's statements. SSR 96–7p, 61 Fed. Reg. 34483 (July 2, 1996). In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work record; and (8) the plaintiff's demeanor during the hearing. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); Jury v. Colvin, No. 3:12-cv-2002, 2014 WL 1028439 (M.D. Pa. Mar. 14, 2014). When the Court reviews  the ALJ's decision, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters v. Commissioner of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citing Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.")). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The ALJ provided the reasons for discounting Plaintiff's credibility. "The claimant testified and stated in the record that she has 'extreme' fibromyalgia, a vitamin D deficiency, feelings of depression, disturbed sleep, and that her 'brain has dropped into her neck, which causes memory loss' and bloodshot eyes. The claimant alleges difficulty lifting, squatting, bending, standing, reaching, walking, kneeling and stair climbing. She also alleges blurred vision, hand pain, occasional loss of hearing, difficulty completing tasks and concentrating, memory loss after two minutes, and

needing rest periods lasting up to one hour between activities. The claimant alleges needing reminders to do things, forgetting what she needs to do half the time, loss of energy, that it 'takes everything' to leave the house, has increased fears, does not sleep longer than one hour during the night and can go without eating for a whole week. She further reports chronic all-over body pain that is exacerbated by everything she does, experiences panic and anxiety attacks, has restless leg syndrome, and showers only once a week. The claimant testified that she does not grocery shop, has pain standing 10-30 minutes before needing to sit for an hour, does not require naps during the daytime, and smokes one-half of a pack a day. She testified that she has a burning, stabbing, shocking and cramping type pain in her back, has disturbed sleep and nightmares, problems concentrating, hears voices and loud banging, does nothing during the day except light dusting and sweeping, and has head and ear aches 5 times a week without improvement despite medication." (Tr. 16-17).

The ALJ continued his credibility analysis. "In terms of the claimant's alleged symptoms, January and February 2009 examination reports by Dr. Zeshonsky, a family practitioner, show that the claimant 'vehemently denied' feeling depressed. In addition, it was noted that despite the claimant's reports of ongoing pain from fibromyalgia with positive trigger points, she was also noted to have tenderness to the touch of her arms and legs to 'inappropriate levels of pain for minimal pressure.' These notes also show that the claimant had intact gait and station, and denied any medication side effects . . . An examining neurosurgeon determined that the claimant's Arnold-Chiari formation was not responsible for her issues, and it was questionable whether the claimant truly had a primary fibromyalgia syndrome. In August 2009, the claimant reported having less musculoskeletal aches and pains with medication. She was repeatedly encouraged to start a pool exercise program and therapeutic exercises. Subsequent reports from her rheumatologist, show that

the claimant had tenderness in her fingers and wrists but that her symptoms were managed on medication. In May 2010, the claimant was described as being very pleasant, had no cyanosis or edema of the extremities, had 5/5/ strength in the upper and lower extremities and a normal gait." (Tr. 17) (emphasis added).

"An April 2010 psychological consultative examination performed by Dr. Joseph Levenstein shows that the claimant reported feelings of anxiety with anxiety / panic attacks, but that she reported drinking 1-2 pots of coffee a day. Upon examination, the claimant was well oriented despite her reports of episodes of disorientation, showed no evidence of delusions or hallucinations, and had adequate attention and concentration, logical thought processes, but impaired cognitive functions due to limited overall intellectual functioning. Psychiatric progress notes from Dr. Johar Shah show that the claimant reported improvement in her mood swings, having good concentration, fluctuating energy levels and a brighter affect. In January 2012, it was noted that the claimant had not been taking medications secondary to financial reasons, and as a result, reported increased difficulty with going outside, sleeping, and concentration. However, she was described as being cooperative, having normal speech and thought process, and intact cognition. There also appears to be a gap in psychiatric treatment from February 2011 until February 2012." (Tr. 18).

"The [ALJ] notes for the record that although the claimant reports severe symptomology with an inability to do much of anything due to her pain and depression, not eating for a week at a time, needing frequent periods of rest and having headaches / ear aches 5 times a week despite medication, the medical and examination findings do not support the alleged degree of severity. In fact, a treating physician, Dr. Diehl, did not seem alarmed by the claimant's presentation or her complaints, and notes that she has 'generalized myalgias.' The claimant is considered stable with medication compliance; and she is repeatedly reminded as to the benefits of an exercise program. The claimant

has not required counseling for her symptoms of depression and anxiety, and she is only managed pharmaceutically by a psychiatrist. The claimant had a significant gap in treatment from February 2011 through January 2012, at which time she presented with increased symptomology secondary to not being on medication for financial reasons." (Tr. 18).

An ALJ's credibility determinations are entitled to deference. S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 271 (3d Cir. 2003). Moreover, the ALJ is required to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. Hartranft, 181 F.3d at 362 (noting, "allegations of pain and other subjective symptoms must be supported by objective medical evidence" and citing 20 C.F.R. § 404.1529).

In discussing Plaintiff's credibility, the ALJ noted that Plaintiff's mood was stable with medication compliance and that she was repeatedly reminded by her family physician about the benefits of an aquatic exercise program (Tr. 18, 257, 554, 697). The ALJ noted that Plaintiff had not required counseling for her symptoms of depression and anxiety, and was only managed with medication by her psychiatrist (Tr. 18).

Although Plaintiff states the ALJ's credibility finding was inadequately supported, based only upon Plaintiff's denials of depression, and the limited abnormal findings in fibromyalgia (Pl. Br. 31-32), the ALJ pointed to other substantial evidence. Dr. Zeshonsky, who was familiar with Plaintiff's complaints of aches and pains, diagnosed her with fibromyalgia and suspected depression (Tr. 553). He referred Plaintiff for a rheumatology and a psychiatric consultation (Tr. 553).

Dr. Zeshonsky prescribed a four-week aquatic physical therapy program for Plaintiff's fibromyalgia and continued her on Cymbalta, the same medication prescribed by Dr. Shah (Tr. 257, 554). As the ALJ noted, Plaintiff did not follow through the aquatic exercise program (Tr. 18, 257,

554, 697).

In his August 7, 2009 follow-up, Dr. Zeshonsky noted that Plaintiff had been put on a higher high dose of Cymbalta and begun on Trazodone by Dr. Shah (Tr. 841). Plaintiff stated her anxiety was better and reported having "less musculoskeletal aches and pains" (Tr. 841). Dr. Zeshonsky again recommended that Plaintiff follow-up with the aquatic physical therapy he had previously ordered (Tr. 842). The record shows that Plaintiff's depression and pain complaints improved with medication, but Plaintiff was resistant to other physical therapies that Dr. Zeshonsky recommended. As the ALJ noted, Dr. Zeshonsky suggested that Plaintiff was not permanently disabled and could return to work with treatment (Tr. 19, 334-335, 555). The ALJ declined to fully credit Plaintiff's subjective allegations, and articulated reasons, supported by substantial evidence, for that conclusion.

As the Third Circuit recognized, medical conditions which can be reasonably controlled by medication or treatment are not considered disabling. 20 C.F.R. § 416.930; Brown, 845 F.2d at 1215. The ALJ discussed the all of the opinion evidence, but ultimately found that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible (Tr. 17-18). An ALJ is not required to give great weight to subjective complaints that are not supported by medical evidence. See Schaudeck v. Comm's of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999).

Determinations of credibility "are for the ALJ to make." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 765 (3d Cir. 2009). The Court is "not permitted to weigh the evidence or substitute [its] own conclusions for that of the fact-finder." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). Applying these standards, there is no basis to override the ALJ's reasonable determination that Plaintiff's symptoms did not render him incapable of even a limited range of simple, sedentary work.

Thus, the ALJ's decision was consistent with the medical evidence in the record and Plaintiff's testimony at the ALJ hearing. Accordingly, substantial evidence supports the ALJ's findings regarding Plaintiff's credibility.

## V.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; <u>Brown</u>, 845 F.2d at 1213; <u>Johnson</u>, 529 F.3d at 200; <u>Pierce</u>, 487 U.S. at 552; <u>Hartranft</u>, 181 F.3d at 360; <u>Plummer</u>, 186 F.3d at 427; <u>Jones</u>, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr.</u>, 806 F.2d at 1190. Here, a reasonable mind might accept the evidence as adequate, and the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate order in accordance with this memorandum to deny Plaintiff's appeal will follow.

Dated: September 30, 2014

s/Gerald B. Cohn
_____
GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE